SHIH WEI SU, Petitioner–Appellant,

v.

Gary H. FILION, Superintendent, Coxsackie Correctional Facility, Respondent–Appellee.

Docket No. 02–2683.

United States Court of Appeals, Second Circuit.

Argued: April 21, 2003.

Decided: July 11, 2003.

---

---

Katheryne M. Martone, Legal Aid Society, Brooklyn, New York, for Appellant.

Donna Aldea, Assistant District Attorney, for Richard A. Brown, District Attorney for Queens County (John M. Castellano, Lisa Drury, Assistant District Attorneys, on the brief), Kew Gardens, New York, for Appellee.

Before: CALABRESI, F.I. PARKER, SACK, Circuit Judges.

CALABRESI, Circuit Judge.

Petitioner–Appellant Shih Wei Su has brought a habeas corpus petition under 28 U.S.C. § 2254 challenging his conviction in New York state court on two counts of attempted murder in the second degree, two counts of assault in the first degree, and one count of criminal possession of a weapon in the second degree. He claims that the prosecution misled the trial court concerning the cooperation agreement it had with a key witness, Jeffrey Tom, and that the prosecution knowingly allowed Tom to perjure himself.

The district court (Ross, *J.*) first found that the state courts that had reviewed Petitioner's conviction had adjudicated his prosecutorial misconduct claim on the merits. The court then held that the prosecution had breached both (a) its duty to disclose exculpatory evidence, *see, e.g., Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and (b) its duty not to elicit testimony it knows to be false, *see, e.g., Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). The district court did not, however, grant the writ of habeas corpus. It concluded that Petitioner had not shown sufficient prejudice to justify overturning his conviction. Nevertheless "on the question of whether petitioner has demonstrated that the prosecutorial misconduct so prejudiced his conviction as to undermine confidence in the jury's verdict," the court granted a certificate of appealability. Joint Appendix at 6.

We agree with the district court that the prosecution knowingly elicited false testimony from a crucial witness with regard to a cooperation agreement that existed between that witness and the prosecution. But we believe the district court erred in its analysis of the prejudice stemming from the prosecutor's misconduct. Because we reverse the order of the district court on this ground, we do not reach any of Petitioner's additional allegations of prosecutorial misconduct, neither those linked to other putative lies by the same witness nor those that stemmed from the asserted *Brady* violations.

*The shooting*

The criminal charges against Petitioner arose out of a shooting that occurred at a pool hall in Queens on January 4, 1991. Tom—the witness whose testimony is the subject of the habeas petition—testified that he entered the pool hall on that date and, together with two individuals he said were fellow members of a street gang known as the Green Dragons,[1] sat down near the entrance. Tom further testified that there were "close to maybe 30" other people there at the time. He added that, shortly thereafter, three men and one woman came from the back of the establishment toward the entrance to pay for a pool table. The table was near where Tom and his companions were sitting. Tom testified that he knew two of the four by name: Petitioner, who was allegedly wearing a sling on his right arm, and a man Tom called Jimmy. Tom stated that the four were members of a rival gang—known as the White Tigers—which frequented the pool hall.

Tom added that the Dragons and the Tigers had not previously engaged in violence against each other. They had been hostile but the manifestation of this rivalry had been "[j]ust basically words said back and forth." Consistent with this, when Petitioner and his companions approached the counter to pay for a pool table, there were "stares going back and forth" between the gangs. The staring lasted about a minute.

According to Tom, however, after the White Tigers had paid for their table, he heard Petitioner say to Jimmy, "[W]hen I leave shoot them." Tom reiterated a slight variation—"Shoot them when I leave."—on cross-examination and added that he remembered the statement dis-

tinctly because Petitioner had said it loudly.

Tom continued that Petitioner, having made the statement, walked out of the pool hall. At that point, the man Tom knew as Jimmy allegedly removed his jacket, revealing a gun. Tom then ducked, heard shots fired, and, a minute later, got up to find one of his companions with a gunshot wound. Tom says he quickly ran outside and saw Petitioner and the other White Tigers "half way down the block already running." Tom did not explain what he and his companions did upon hearing Petitioner's "loud" order to shoot them or while Petitioner was walking out of the pool hall.

The rest of the testimony at trial, though on the whole supporting Tom's testimony, was inconclusive. Thus Matt Sacoll, who ran the pool hall and allegedly had known Petitioner for several months, testified that he did not recall seeing Petitioner at the pool hall on the night in question. Sacoll said that while putting away tools behind the counter, he heard gunshots. Looking up, he saw a woman and two men, one of whom had a gun; the three then fled the scene. Petitioner, he asserted, was not one of the three.

Similarly, one of Tom's two companions said Petitioner was the person who had said, "Shoot them." But the other, while stating that the person who had given the order to shoot was wearing a sling, could not identify Petitioner as the perpetrator. There was, however, medical evidence that Petitioner had been wounded in the arm several days before the shooting. But Donna Wan, the proprietor of a beauty shop, testified that Petitioner had been in her shop just before January 1 to have his hair washed. Although she noted stitches and a nasty wound to Petitioner's upper

---

1. Both of these individuals denied at trial that they were members of the Green Dragons.

arm, Petitioner was not then wearing a sling.

None of the other "maybe 30" people in the pool hall were called on by the state to confirm the "loud" order or that Petitioner had given it.

*Tom's cooperation agreement*

The issue before us arises from testimony Tom gave at Petitioner's trial regarding Tom's arrest for grand larceny and the ensuing plea and sentencing agreement Tom made with the prosecution. About one month after Petitioner's arrest for the pool hall shooting, Tom was charged with attempted grand larceny in the second degree. In September 1991, several months before Petitioner's trial, Tom pleaded guilty. In chambers, before Tom's judge, Tom's prosecutor gave his understanding of the condition of the plea Tom was making:

> Condition of the plea[,] the terms and conditions of the plea, as I understand them, Judge, is that the defendant will plead to the only remaining count in the indictment and be offered a promise of [Youthful Offender status] and probation. Further conditioned upon his continued cooperation with my office, which may include offering testimony, truthful testimony in a homicide case with which he's been cooperating . . . .

Toms's defense counsel and Tom himself then confirmed that this was the agreement. His counsel said, "My client has testified in the Grand Jury and is prepared to continue with whatever is needed, including, viewing line-ups, giving testimony, etc." These discussions were sealed by Tom's court, and Tom proceeded to enter his plea. In so doing, Tom specifically answered in the affirmative the judge's question as to whether Tom had attempted to steal money from a restaurant owner · "by means of extortion, in that [Tom] at-

tempted to steal that money by instilling in [the owner] a fear [that] if she did not turn over the money to [Tom], that [he would] cause her injury."

Subsequently, at Tom's sentencing, Tom's court indicated that Tom had pleaded guilty and "was *promised* five years probation and youthful offender treatment" (emphasis added). The assistant district attorney then said, "Your Honor, I ask you to honor the negotiated plea, and I also ask to reiterate the fact that this defendant [Tom], as part of his plea and as part of the promised sentence, was to give truthful testimony as he did in the Grand Jury and the trial that's ongoing in part J–10." After Tom's defense counsel waived the opportunity to speak, the court stated, "Consistent with the promise made, the sentence of the Court is five years probation."

Before the start of Petitioner's trial, Petitioner's prosecutor disclosed that Tom had pleaded guilty and was awaiting sentence. But while the prosecutor went on to say that Tom's judge "basically told the defendant that if he pled to the indictment, . . . he would get probation," Petitioner's prosecutor also stated that while "there might have been some talk about [Youthful Offender treatment]," "[t]here was technically no agreement, as far as [the prosecutor knew.] [N]othing was put or the record other than bench conferences that [Tom] continued to cooperate as a witness on this case and testify honestly during this trial if he were called as a witness."

On direct examination at Petitioner's trial, and on the same day as Tom's sentencing, the prosecutor elicited the following testimony from Tom:

> Q: Can you tell us whether or not you have been sentenced on that case?

A: Yes. I have.[2]

Q: Did the District Attorney's office make any promise to you with regard to what your sentence would be?

A: No.

Q: Would you please tell us what if anything the District Attorney's office, either myself or another Assistant District Attorney, promised you with regard to a sentencing on that case [sic]?

A: Nothing at all.

. . . .

Q: We had contacted you and wanted you to continue to be a witness on this case?

A: Yes.

. . . .

Q: Did the Judge that you stood in front of make any recommendation about what your sentence should be?

. . . .

Q: The judge in the courtroom where you were sentenced what if anything did that Judge do with regard to your sentence?

A: He didn't promise me anything.

Q: Did he in fact sentence you?

A: Yes.

Q: And he sentenced you prior to your coming to Court to testify here?

A: Yes.

Q: What was the sentence of the Court?

A: He gave me five years probation.

. . . .

Q: Did the Judge give you youthful offender treatment?

A: Yes.

On cross-examination, Petitioner's counsel did not make any further inquiry into Tom's plea agreement. Tom was asked, however, about the nature of his conviction and responded, "Well, maybe a month before [my arrest] I went in and I asked the owner for money." Petitioner's counsel then asked, "You just asked him politely for money, is that it?" Tom answered, "Yes." When questioned about whether he had made any threat, Tom replied that he had not. Asked, further, if this is what he told the judge when he pleaded guilty, Tom said that he told the judge that he and his friend had gone into the store and asked for money.

Out of the hearing of the jury, defense counsel argued to the judge and the prosecutor that Tom had lied about the circumstances of the attempted larceny. Counsel said to the prosecutor, "He's lying right there, you have a responsibility—he extorted money out of that guy." The prosecutor did not, however, make any attempt to correct Tom's manifestly false statement. Indeed, when defense counsel mentioned the implausibility of Tom's tes-

**2.** The federal district court considering the habeas petition now before us found Tom's testimony that he had been sentenced prior to testifying against Petitioner to be false. Our review of the record is inconclusive on this point. The sentencing definitely occurred on the same day that Tom appeared as a witness in this case. The state's contention that the sentencing occurred first is based on the facts that (1) Tom's prosecutor greeted Tom's sentencing court by saying, "Good morning, your Honor," whereas Tom's testimony against Petitioner in Petitioner's trial did not conclude until 12:40 p.m., and that (2) Tom accurately described in his testimony the sentence he actually received. Neither of these facts is determinative and there is evidence pointing the other way on the basis of which the district court made its finding. In fact, the state and Petitioner have not, despite all the years that this case has been under review, produced a definitive answer to this question. We need not, however, resolve the issue of the timing of Tom's sentence in relation to his testimony, and whether Tom lied about it, since we find other testimony by Tom to be clearly false and sufficient to compel us to grant the writ of habeas corpus.

timony on this point in summation, the prosecutor, unsuccessfully, objected. And in her summation, despite her knowledge to the contrary, the prosecutor made a generalized effort to bolster Tom's credibility. "[T]he other two witnesses [, one of whom was Tom,] were honest with you. [Defense counsel] would want you to believe ... first of all, that they were evasive. I submit they were not." "Ladies and gentlemen of the jury, I submit to you that what they told you was truthful, and honest."

*The Procedural History of this Case and its Effect on the Standard of Review*

On direct appeal in state court, Petitioner, in addition to claiming, *inter alia,* that the evidence against him was insufficient to support a conviction, asserted (a) that Tom had testified falsely when he stated that he had not received a promise of leniency from either the judge or the prosecution in exchange for his testimony against Petitioner and (b) that the prosecution's elicitation of that testimony was unconstitutional and prejudicial. The state argued both that this assertion was without merit and that it was not preserved for appellate review because Petitioner failed to provide an adequate record on appeal to support the claim and failed to object at trial.

The Appellate Division summarily affirmed the conviction. It rejected Petitioner's argument that the evidence was insufficient to support the guilty verdict and stated that "[t]he defendant's remaining contentions are either unpreserved for appellate review or without merit." *People v. Shih–Wei Su,* 213 A.D.2d 502, 624 N.Y.S.2d 904, 904 (1995). Since the prosecutorial misconduct allegation was among Petitioner's "remaining contentions," it is not clear from the face of the order whether the Appellate Division adjudicated this allegation on the merits, or decided it on

procedural grounds. *See Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 810–11 (2d Cir.2000) ("[W]hen a state court uses language such as '[t]he defendant's remaining contentions are either unpreserved for appellate review or without merit,' ... [t]he state court has not adequately indicated that its judgment rests on a state procedural bar, and its reliance on local law is not clear from the face of the court's opinion." (citation omitted)).

Over the ensuing years, Petitioner, in various ways, sought to raise in state courts the issue that he has now brought before us. We need not, however, examine these claims in detail. Some of them seem to have been designed to show cause for possible procedural defects, e.g., by attacking the effectiveness of counsel. Others involved allegations that went directly to the merits, e.g., alleging newly discovered evidence. The answers given by the state courts, moreover, do not make clear whether the denials of these claims were on procedural grounds or were merits-based.

What might, however, be a mare's nest is readily avoided. The state has waived the argument that Petitioner's claims are procedurally barred, thereby obviating the need for us to examine whether there was federally valid cause and prejudice, *see, e.g., Jones v. Keane,* 329 F.3d 290, 296 (2d Cir.2003), for such a default. Instead, the state asserts that the decisions made by the state courts constituted an adjudication on the merits of Petitioner's claims, and as such require us to give those decisions deference under the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 ("AEDPA"), as interpreted by this court in *Sellan v. Kuhlman,* 261 F.3d 303 (2d Cir.2001). In fact, the degree of deference due state holdings in circumstances such as those before us is, under our cases,

anything but clear.[3] Nevertheless, since (a) the state manifestly can waive procedural objections, *see, e.g., Cossel v. Miller*, 229 F.3d 649, 653 (7th Cir.2000), and (b) treating the state decisions as merit adjudications and giving them full AEDPA deference, we conclude that a grant of habeas is required, we need not—and hence do not—resolve the complex questions that might arise from this case's long and tortured procedural background.

Accordingly, we now turn to why we believe that the state court's adjudication of the Due Process claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," the standard of review required under the AEDPA. 28 U.S.C. § 2254(d)(1).

*The State's Knowing Elicitation of Perjury*

■ Since at least 1935, it has been the established law of the United States that a conviction obtained through testimony the prosecutor knows to be false is repugnant to the Constitution. *See Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935). This is so because, in order to reduce the danger of false convictions, we rely on the prosecutor not to be simply a party in litigation whose sole object is the conviction of the defendant before him. The prosecutor is an officer of the court whose duty is to present a forceful and truthful case to the jury, not to win at any cost. *See, e.g., Jenkins v. Artuz*, 294 F.3d 284, 296 n. 2 (2d Cir.2002) (noting the duty of prosecutors under New York law "to seek justice, not merely to convict").

■ Despite the fundamental nature of the injury to the justice system caused by the knowing use of perjured testimony by the state, the Supreme Court has not deemed such errors to be "structural" in the sense that they "affect[ ] the framework within which the trial proceeds." *United States v. Feliciano*, 223 F.3d 102, 111 (2d Cir.2000) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 307–10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (brackets in original)). Structural errors are those that " 'so fundamentally undermine the fairness or the validity of the trial that they require voiding [the] result [of the trial] regardless of identifiable prejudice.' " *Id.* (quoting *Yarborough v. Keane*, 101 F.3d 894, 897 (2d Cir.1996)). Instead, even when a prosecutor elicits testimony he or she knows or should know to be false, or allows such

---

**3.** In *Ryan v. Miller*, 303 F.3d 231, 246 (2d Cir.2002), we granted AEDPA deference to a state court that had used the language that a particular claim was "either unpreserved for appellate review or without merit." But we did this, and treated the state decision as on the merits, because the record showed that the petitioner had preserved the disputed claim at every stage, thereby indicating that the Appellate Division had not denied that claim because it was unpreserved. *Id.* at 246 n. 6. Conversely, we have also held that where a state court's ruling does not make clear whether a claim was rejected for procedural or substantive reasons and where the record does not otherwise preclude the possibility that the claim was denied on procedural grounds, AEDPA deference is not given, because we cannot say that the state court's decision was on the merits. *Miranda v. Bennett*, 322 F.3d 171, 178 (2d Cir.2003). And we did so fully aware that we have also "explicitly h[e]ld that when a state court uses language such as '[t]he defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review." *Fama*, 235 F.3d at 810.

In other words, our cases seem to contemplate situations in which, because of uncertainty as to what the state courts have held, no procedural bar exists and yet no AEDPA deference is required. But, to decide the instant case, we need not determine whether that indeed is so.

testimony to go uncorrected, a showing of prejudice is required. But the Supreme Court has made clear that prejudice is readily shown in such cases, and the conviction must be set aside unless there is no "reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *see also United States v. Wallach,* 935 F.2d 445, 456 (2d Cir.1991) (citing *Agurs* and adding that the Supreme Court cases mean that "if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic" (quotation marks omitted)). This then is the "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), that we must apply in the case before us. And to do this we must ask: (1) whether false testimony was introduced, (2) whether that testimony either was or should have been known to the prosecution to be false, (3) whether the testimony went uncorrected, and (4) whether the false testimony was prejudicial in the sense defined by the Supreme Court in *Agurs.*

*Whether there was testimony known to the prosecutor to be false*

 As the district court found, the first three prongs of the inquiry are easily met. Tom's statement made in open court that he was not promised anything by the sentencing judge or by the prosecution in exchange for his testimony is, in light of the transcript of Tom's allocution and sentencing, obviously false. It is also clear that Tom lied about the nature of the attempted larceny charge. The prosecution not only allowed both of these misrepresentations to go uncorrected, but it bolstered Tom's credibility in summation,

even going so far as to object when Petitioner's defense counsel expressed incredulity that Tom's larceny arrest came after he "politely" asked the restaurant proprietor for money.

The prosecutor in Petitioner's case was apparently not the one who had made the plea deal with Tom. But the Supreme Court has held that that doesn't matter. *See Giglio,* 405 U.S. at 154, 92 S.Ct. 763. "The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government." *Id.* It follows that, before a prosecutor puts to the jury evidence that a witness has made no deal with the government, he or she has a fundamental obligation to determine whether that is so. That obligation was not met here.

*Whether there was sufficient prejudice*

Having agreed with the district court that the prosecution failed in its duty to avoid eliciting false testimony, we are left to decide whether this breach injured the defendant in the relevant way. "A new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury." *Giglio,* 405 U.S. at 154, 92 S.Ct. 763 (quotation marks and alterations omitted).

### A.

As far as the Supreme Court cases are concerned, this is all that is required. But in *United States v. Helmsley,* 985 F.2d 1202, 1208 (2d Cir.1993), we held that, at least for purposes of a collateral attack, a defendant is normally required to exercise due diligence in gathering and using information to rebut a lying prosecution witness. Having so held in *Helmsley,* we could hardly deem unreasonable a state court decision made on a similar ground. And so we must examine whether it would

be unreasonable to hold that Petitioner failed, in the instant case, to exercise due diligence.[4]

Petitioner's only possible lack of diligence was his failure to cross-examine Tom about the existence of a sentencing deal. Significantly, the state does not argue that Petitioner knew the details of the sealed agreement or that Petitioner even knew for sure that there was a deal. Rather, it contends only that Petitioner had some information that a deal *might* have been made. But, Petitioner's prosecutor expressly (a) falsely denied before trial that an actual agreement had been reached with Tom and (b) falsely established on direct examination that no promises with respect to Tom's sentence had been made to Tom either by the state or by the sentencing judge.

■ In other words, in order to do what the state suggests Petitioner should have done, Petitioner would have been required to assume that the prosecutor had lied. This would involve enormous tactical danger. And it seems hardly reasonable to require a defendant to risk opening the door to adverse testimony concerning a sentencing agreement from a government witness on the chance that the prosecutor had both intentionally mischaracterized that witness's dealings with the government before trial and knowingly elicited false testimony denying that an agreement had been made. But even apart from that, the Supreme Court, in an analogous situation, has made clear that conscientious counsel *can* rely on prosecutors to live up to their obligations. *See Strickler v. Greene*, 527 U.S. 263, 286–87, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) ("The presumption, well established by tradition and experience, that prosecutors have fully discharged their official duties is inconsistent with the novel suggestion that conscientious defense counsel have a procedural obligation to assert constitutional error on the basis of mere suspicion that some prosecutorial misstep may have occurred." (internal citation and quotation marks omitted)). It follows that when a prosecutor says that there was no deal and later elicits testimony from a witness denying the existence of a deal, it would be an unreasonable application of federal law, as determined by the Supreme Court, to fault the defendant for not proceeding in his cross-examination on the assumption that the prosecutor is a liar.

4. That said, we should note that *Helmsley* itself is quite limited in its scope. For, as we said in *Helmsley*, an exception to the diligence requirement exists when the prosecutor was "directly involved as a participant in the transaction about which the witness has allegedly lied." *Id.* at 1207. Such direct participation by the prosecutor both makes clear the prosecutor's knowledge of the falsity of the statement and leads to a situation in which contradiction of the witness's testimony "runs the risk of implicating the credibility of the prosecutor before the jury." *Helmsley* itself, instead, dealt only with a situation in which the defendant had in her hands the documents that could have been used to discredit the prosecution witness and in which the witness's lie did not concern conduct in which the government had played a part. In this respect, our decision in *Jenkins*, which was decided after *Helmsley* and applied AEDPA deference, deserves mention. In *Jenkins*, the prosecution revealed before trial that it had made a plea agreement with one of its witnesses. 294 F.3d at 287. But, on cross-examination, the witness steadfastly denied that any such deal was made. On redirect, the prosecutor asked the witness whether the witness had made any deals with *her*. The witness replied he had not, which was technically true, because the deal had been reached with another assistant district attorney. *Id.* at 288–89. Not surprisingly, the *Jenkins* court decided that the prosecution's conduct, in light of its pretrial admission, could not have been anticipated by defense counsel, who had done the best he could under the circumstances.

## B.

We, therefore, move to apply directly the test given to us by the Supreme Court, which has told us that convictions in cases of this sort must be reversed unless the evidence was so overwhelming that there is no "reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103, 96 S.Ct. 2392.

█ It is not disputed that Petitioner's conviction depended significantly on Tom's testimony. Indeed the district court described him as "[t]he prosecution's chief witness against petitioner." *Shih Wei Su v. Filion*, No. 01–CV–3799, slip op. at 2 (E.D.N.Y. Oct. 7, 2002). While a likely associate of Tom's also identified Petitioner as the one who gave the order to shoot, another did not, and there was other acceptable testimony running in favor of Petitioner.

The case was not overwhelming either way. On the one hand, the evidence was surely sufficient to uphold the jury conviction, and would have been so without Tom's testimony. On the other, the jury could also have perfectly reasonably acquitted Petitioner even without being told about the plea agreement. The additional evidence that Tom had a deal with prosecutors and with his sentencing judge was certainly material to assessing Tom's credibility, and that credibility could not help but be central to the deliberations of any reasonable jury sorting through the facts of the case. And, as the Supreme Court said in *Napue*: "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue*, 360 U.S. at 269, 79 S.Ct. 1173. Here Tom's possible interest in testifying falsely was anything but subtle. And that interest, as the district court found, was kept from the jury, in substantial part by the prosecutor's own behavior.[5] There was, in other words, as we found in *Jenkins*, a "heightened opportunity for prejudice[, since] the prosecutor ... [was] complicit in the untruthful testimony." 294 F.3d at 295.

In *Jenkins*, despite our grant of AEDPA deference, the conviction was reversed. 294 F.3d at 291, 297. Likewise here, we conclude that it would be an unreasonable application of the standard for prejudice clearly set out by the Supreme Court, in cases like *Napue*, *Giglio*, and *Agurs*, to find insufficient prejudice in this case.[6]

---

5. Since Tom's lies about his plea deal suffice to show prejudice, we have not discussed Tom's other misstatements of which the prosecution was aware. A few words about one of these, Tom's erroneous testimony regarding the nature of his conviction for attempted grand larceny, is in order, however. This testimony was the subject of Petitioner's attack on Tom's credibility at summation and was also questioned during trial. But it is still quite troublesome that the jury was presented only with Petitioner's invitation to doubt the general plausibility of a grand larceny conviction for asking "politely" for money. The prosecution knew the facts were otherwise, and it should have corrected the misimpression left by its principal witness rather than stating broadly that Tom had tes-

tified truthfully. The jurors may well have assumed that the prosecutor knew the nature of Tom's conviction. If so, why would the prosecutor say that Tom was truthful if the circumstances of the conviction were not at all as Tom had described them? It is, therefore, hard to be confident that a correction by the prosecutor on this point would not have affected the jury's evaluation of Tom as a witness.

6. Because more reasons for the result we reach are not needed, we have not included in our discussion any account of the possible effect on a jury of the fact, in itself, that Tom lied under oath. This fact would likely negatively impact Tom's credibility as much or

*Conclusion*

There being no question that false testimony was introduced to bolster the credibility of the principal prosecution witness and there being no reasonable application of federal law under which it could be said that the prejudice suffered by Petitioner fell short of the legal standard established by the Supreme Court of the United States, we REVERSE the district court's denial of Petitioner's request for a writ of habeas corpus, and we REMAND the case to that court with instructions to grant the writ and to order Petitioner released unless the state affords him a new trial within sixty days.

more as the revelations of the true nature of his grand larceny conviction or of his plea agreement with the prosecution. Significantly, we have previously held that the very fact of the witness's untruthfulness is itself relevant to an analysis of prejudice. *Wallach*, 935 F.2d at 458 (citing and quoting *United States v. Stofsky*, 527 F.2d 237 (2d Cir.1975)). Similarly, we need not decide whether an analysis of prejudice should include how devastating to the state's case it might have been had the jury learned that the prosecutor knowingly (or recklessly) elicited the false testimony.