**Clinton TURNER Petitioner,**

v.

**Sunny L. SCHRIVER, Respondent.**

**No. 97CV3074(NG).**

United States District Court,
E.D. New York.

July 21, 2004.

Leon Friedman, New York City, for plaintiff.

Johnette Traill, Queens County District Attys. Office, Kew Qarden, NY, for defendant.

### ORDER

GERSHON, District Judge.

Petitioner brings this petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging his 1988 conviction, after a jury trial, in the New York Supreme Court, Queens County (Sherman, J.), of Robbery in the First Degree in violation of N.Y. Penal Law § 160.15; Robbery in the Third Degree in violation of N.Y. Penal Law § 160.05; and Grand Larceny in the Fourth Degree in violation of N.Y. Penal Law § 155.30. Petitioner was sentenced as a second felony offender to an indeterminate term of imprisonment of ten to twenty years on the Robbery in the First Degree count, and concurrent terms of two to four years on the Robbery in the Third Degree and Grand Larceny counts. Petitioner has completed his term of imprisonment.

The Appellate Division, Second Department, affirmed the conviction. *People v. Turner,* 187 A.D.2d 469, 589 N.Y.S.2d 895 (2d Dept.1992), *lv. denied,* 81 N.Y.2d 894, 597 N.Y.S.2d 956, 613 N.E.2d 988 (1993). Petitioner's two motions under N.Y. Criminal Procedure Law ("CPL") § 440.10 are discussed below.

### *The Trial*

At petitioner's trial for the robbery of William Clarke, the prosecutor called three witnesses: Police officers John Cardo and Paul Krien, and Mr. William Clarke.

Officer Cardo testified that, at around five a.m. on October 17, 1987, he responded to a radio call of an assault in progress and found four individuals arguing over a Toyota that was parked in front of a Dunkin' Donuts on College Point Avenue in Brooklyn, NY. Three of the individuals were black males and one was a white male. The white male, Mr. Clarke, told Officer Cardo that, as he was walking to his car, he was approached by four individuals, the three black males who were present and one person who fled after robbing him. The robber was carrying a knife and wearing black pants, a shirt, and had a Ninja mask over his face. He was approximately six feet tall and around thirty years old. Mr. Clarke gave the individual with the knife his wallet, which contained approximately $1500 in cash. After the man took his wallet, he pulled the Ninja mask off of his head which allowed Mr. Clarke to see his face. The three black males were placed under arrest and were subsequently transported to the 109th precinct. Officer Cardo wrote the name "Screwgie" on the complaint report as information that pertained to the robber. Mr. Clarke's appearance was normal, and he did not appear to be under the influence of any drugs or alcohol at the time he gave his statement. Officer Cardo did not run a fingerprint check on Mr. Clarke or search him.

Officer Paul Krien testified that he was assigned to the Robbery Investigation Unit at the 109th precinct. In connection with that assignment, he knew that the nickname "Screwgie" belonged to petitioner. On the day of the robbery, after reading the complaint report, he called Mr. Clarke and got a description of the perpetrator. In subsequent conversations, Mr. Clarke told Officer Krien that he was robbed at about 5:15 in the morning after he found some people breaking into his car and that he chased one of the individuals

into one of the project buildings and confronted him. The individual pulled out a knife and wanted Mr. Clarke's wallet and money. Mr. Clarke kicked the individual, at which time the mask he was wearing came off. Mr. Clarke left the scene because there were too many other people there. Mr. Clarke identified petitioner at the line-up at the police station. On cross-examination, Officer Krein stated that, in his first interview with Mr. Clarke, at his residence, Mr. Clarke did not mention that he was approached by four black individuals when he was returning to his car that evening or that one of them pulled a knife on him. Nor did he tell Officer Krien that he was robbed. Mr. Clarke told Officer Krien only that, when he approached his car, he saw three individuals around it and one inside. The person inside was the person with the mask. The first time he saw the knife was after he chased the individual with the mask, for approximately two to three blocks, into one of the project buildings.

Mr. Clarke's testimony was as follows: On October 17, 1987, at approximately 4:45 a.m., he stopped by the Candlewood Bar in Brooklyn, New York. He was driving a Ford Mustang that he parked in front of the Dunkin' Donuts on College Point Boulevard. He had been at a birthday party earlier that night, but he had nothing to drink at the party or at the bar. He does not drink or smoke. The bar was closing, and he asked only if he could look around for some friends he was supposed to meet earlier in the evening.

After he left the bar and was walking back to his car, he noticed that one of the small rear windows seemed broken. As he approached the car, he noticed someone going through the glove compartment. The person got out of the car after Mr. Clarke saw him, and Mr. Clarke chased him across the street and into the housing projects. The individual, later identified

as petitioner, was black with short black hair and had on dark jeans and a dark shirt. After Mr. Clarke chased petitioner into a crowded hallway, petitioner stepped out from behind a pillar and began slashing at him with a large butcher knife without a handle. Petitioner had thrown a hood of some sort over his head at that point. Petitioner grabbed a chain hooked to Mr. Clarke's pants and attached to his wallet and said "give me your money." Petitioner ripped the wallet from Mr. Clarke's back pocket and then told Mr. Clarke to take off his pants. At that point, Mr. Clarke kicked petitioner on his chest and the hood fell off. Mr. Clarke's wallet contained a little less than $100, his driver's license, his social security card and his check cashing card.

When he returned to his car, Mr. Clarke saw three individuals in it who exited the car and then tried to run to a Toyota parked across the street that also had broken windows. Mr. Clarke picked up a pipe and chased the three individuals into the Dunkin' Donuts, locked the door and called the police. When the police arrived, Mr. Clarke told them that there had been four men and that one of them had taken his wallet with a knife. Mr. Clarke described the person who stole his wallet to the police as wearing dark jeans and a dark jacket with a hood. Mr. Clarke did not make any other statement that morning because the officers were "looking to go home." Trial Transcript ("Tr.") 121.

Mr. Clarke picked petitioner out of a line-up and also identified him in court as the person who stole his wallet at knife-point. He had never seen petitioner before that night, and he never received any of the stolen property back. Assistant District Attorney ("ADA") Sligh's closing questions on direct examination were as follows:

ADA Sligh: Have you ever been arrested?

Mr. Clarke: No.

ADA Sligh: Ever been convicted of crime?

Mr. Clarke: No.

Tr. 126–27. Prior to trial, petitioner's counsel had requested, among other things, the arrest and conviction records of any witnesses the State intended to call. The District Attorney's office did not make any response to that request.

On cross-examination, when Mr. Clarke was asked how often he was down in the area of the alleged crime, ADA Sligh objected. At sidebar the following colloquy occurred:

ADA Sligh: I fail to see the relevance in whether Mr. Clarke was in the area four times a week or five times a week. I would like an offer of proof. Certainly he's not going to say that he's in that area, and his client lives there, and he saw his client there, so it must be perhaps he was there to buy drugs or something which is ridiculous.

Defense: That this man has been in the area on a regular time, on a regular basis, known to the people in the area, including the defendant.

The Court: He knows the defendant?

Defense: Yes, your honor.

Tr. 128–130. At that point defense counsel proceeded on the record.

Defense: Approximately how many nights a week are you in this vicinity of College Point Boulevard?

Mr. Clarke: Very rarely. But on Friday nights, the guys I work with get together and they go to that bar almost every Friday night.

Defense: That's the Candlewood Bar?

Mr. Clarke: Yes, Sir.

Defense: And you never buy drugs on that street; do you sir?

Mr. Clarke: No, sir.

Defense: You do not use any controlled substances?

Mr. Clarke: No, sir.

Defense: You never used them?

Mr. Clarke: No, sir.

Defense: You don't know this defendant; do you?

Mr. Clarke: No, sir.

Defense: Ever been in the projects before?

Mr. Clarke: No, sir.

Tr. 131–32. Mr. Clarke testified that he never told the police or anyone else that petitioner was wearing a Ninja mask. Mr. Clarke did not see petitioner take anything out of his car. Petitioner did not have anything on his head when Mr. Clarke found him in the car or during the chase, and Mr. Clarke never told the police that there was anything on his head at that time.

Petitioner took the stand on his own behalf and testified as follows: He did not rob anyone on October 17, 1987, but he had been convicted of other crimes. He met Mr. Clarke in March of 1987 in one of the parks in the neighborhood and sold drugs to him up until the time of the alleged robbery. Petitioner was using crack and heroin at that time. He knew that Mr. Clarke drove a 1972 Mustang because he had been in the car several times and even to Mr. Clarke's home on one occasion, although he did not go inside. He saw Mr. Clarke approximately three times a week, mostly on weekends. He bought drugs that he sold to Mr. Clarke, but sometimes he would substitute bread crumbs or grits in the supposed vial of crack and keep the real drugs for himself.

Petitioner saw Mr. Clarke on October 16, 1987, the day before the alleged robbery, and sold him four vials filled with crack and four vials filled with fake drugs.

Mr. Clarke told petitioner that some of the vials were not real and petitioner told him "that's what I got." Petitioner knew Mr. Clarke as "Slim," and Mr. Clarke knew him as "Screwgie." Tr. 176. Petitioner maintained that he did not take Mr. Clarke's wallet, never wore any kind of mask, and never threatened Mr. Clarke with a knife.

On cross-examination ADA Sligh asked about the details of all of the arrests and convictions that petitioner mentioned on direct examination including burglary, grand larceny and several misdemeanors. He asked petitioner what the items were that he stole for his petit larceny convictions and where he committed the crime of buying drugs for Mr. Clarke. Petitioner testified that he was arrested for stealing wallets and jeans when he was a drug addict and that he bought the drugs for Mr. Clarke through a hole in the door of an apartment in the projects.

In summation, defense counsel began by stating that petitioner had admitted his criminal record and did not try to hide from the facts of his life. Defense counsel compared Officer Cardo's testimony that Mr. Clarke told him that he was robbed near his car by a man wearing a Ninja mask with that of Officer Krien that Mr. Clarke told him that he saw only one individual in his car, he chased him, and the person stole his wallet at knife-point inside one of the project buildings. Defense counsel also pointed to the inconsistencies between Mr. Clarke's testimony and that of both of the officers and how Mr. Clarke's story changed over time. Counsel argued that these inconsistencies, petitioner's knowledge of where Mr. Clarke lived and the car that he drove, and the implausibility of Mr. Clarke's story, all provided reasonable doubt that a crime had occurred.

In his summation, ADA Sligh stated that Mr. Clarke's coming out of a topless bar at five in the morning was irrelevant and did not give anyone the right to rob him. ADA Sligh said, "[i]f he had been a criminal, which he tells us he has no criminal record, if he had been a murderer, he would have been entitled to protection from this defendant robbing him on that particular morning." Tr. 240. ADA Sligh repeated that Mr. Clarke said that he did not drink and that it was not unreasonable for someone who did not drink to be in a bar at that hour of the morning. As to petitioner's testimony, ADA Sligh told the jury:

> But now ask yourselves, is Mr. Clarke capable of creating this grand frame up? Is he capable? This is what Mr. Clarke would have to do. He would have to fool the first police officer on the scene, He would have to, of course, get Detective Krein involved in the plot. He would then have to go to the Grand Jury and fool the Grand Jury and then he would have to ... get by the district attorney's office and, finally, ladies and gentlemen of the jury, to make this plot work, Mr. Clarke would have to get by you, the jury. He would have to make you believe that the story that the Defendant is telling you is not true. But most of all he will have to convince you about the story. Now of all this, I tell you for four or five vials of crack, that Mr. Clarke is doing this because of four or five vials of crack? That's unrealistic.

Tr. 244–45. ADA Sligh admitted that Officer Cardo's testimony was confusing, but said that he was human and that he confused the facts given to him by Mr. Clarke. According to ADA Sligh, Officer Cardo made a mistake, but Officer Krien was correct. ADA Sligh said:

> Look at Mr. Clarke's testimony. Does he appear to be straight forward? Does he appear to you that he responded to the questions that were asked of him?

Use that in determining Mr. Clarke's credibility. He said he doesn't know the defendant. He says that he's never seen him prior to the date of this particular robbery... I won't ask you to disbelieve the defendant because he has a lengthy criminal record. I won't ask you to disbelieve because of that. Consider it, yes, in determining credibility. But look at the reasonableness of that statement that he took the stand and told you this morning that's what you ultimately want to consider. Credibility. Is it the right man? Believability. You'll decide.

Tr. 249–51. After retiring for deliberations around noon, the jury reached a guilty verdict on all three remaining counts [1] shortly after 11:00 p.m.

### Section 440.10 Proceedings

On October 28, 1993, petitioner filed an application pursuant to Section 440.10 of the New York Criminal Procedure Law to vacate his judgment of conviction based upon newly discovered evidence and requested a hearing on the application. In support of his application, petitioner submitted an affidavit from Mr. Clarke, as well as an affidavit from a fellow inmate who stated that Mr. Clarke had falsely accused that inmate of robbery. Mr. Clarke's affidavit stated: During the time of the alleged robbery he had a serious cocaine and crack addiction as well as serious alcohol dependency that made him behave irrationally; he lied when he said that he had never been arrested or convicted, because in fact he had been "arrested and/or convicted of" burglary, possession of a weapon, criminal mischief, and car stripping; he and petitioner, who had sold him drugs, had an altercation over drugs, but petitioner never robbed him;

petitioner did not have a knife; and he never felt threatened by petitioner. He further stated the reason he was giving this affidavit now was that he had learned that petitioner was put in jail on the basis of his lies, and he was very sorry for his acts; he has since sobered up and has a new wife and baby. The State submitted an affidavit from ADA Sligh, but did not run a rap sheet on Mr. Clarke.

By order dated November 15, 1993, the trial court denied the motion without a hearing, finding that the circumstances of the execution of Mr. Clarke's recantation only served to enhance the inherently suspect nature of recantations generally. The court credited the affidavit of ADA Sligh, in which he stated that Mr. Clarke never appeared to be under the influence of any intoxicants during their meetings or at the time of his trial testimony.

The Appellate Division affirmed the trial court's decision, noting that "it is well-settled that '[t]here is no form of proof so unreliable as recanting testimony.'" It added: "[t]he witness's recantation, which merely impeaches his prior testimony, probably would not change the result if a new trial were granted, and therefore the court properly denied the defendant's motion without a hearing." *People v. Turner,* 215 A.D.2d 703, 628 N.Y.S.2d 122 (2d Dept. 1995) (internal citations omitted). The Court of Appeals denied leave to appeal. *People v. Turner,* 86 N.Y.S.2d 742, 631 N.Y.S.2d 623, 655 N.E.2d 720 (1995).

Petitioner filed a second Section 440.10 motion based upon the claim that the prosecutors knew or should have known about Mr. Clarke's criminal record, but failed to reveal this information to petitioner after he requested it, in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10

---

**1.** Two of the counts in the indictment, Count Two, Robbery in the Second Degree on an acting in concert theory, and Count Five, Grand Larceny in the fourth degree, were dismissed on the State's motion at the close of its case.

L.Ed.2d 215 (1963). Petitioner also raised the claim that Mr. Clarke's recantation was new evidence that tended to show that petitioner's conviction was based on perjured testimony and, therefore, was obtained in violation of due process of law. The State submitted the same affidavit of ADA Sligh that it had submitted on the first Section 440.10 motion, but again did not run a rap sheet on Mr. Clarke. This motion was referred to Justice Joseph G. Golia who, in a decision dated June 14, 1996, denied the motion without a hearing. Justice Golia found that the claim of newly discovered evidence concerning the recantation had already been decided in the first Section 440.10 motion so he was constrained to deny the motion as having been previously addressed. Justice Golia held that there was no *Brady* violation because the District Attorney was under no obligation under New York law to check the possible criminal record of any witness "absent a belief that the witness has a record or that the witness has been untruthful in telling the prosecutor that he has never been convicted." Supreme Ct., Queens County, June 14, 1996. Decision on Motion to Vacate Judgment at 4. The court credited the statement in ADA Sligh's affidavit that "Mr. Clarke told me that he had never been arrested or convicted of a crime" and held that:

> In the case at bar, it was established at trial, and affirmed on appeal, that the prosecution, in good faith, was under the belief that Mr. Clarke did not have a criminal record. Indeed, Mr. Clarke confirms in his affidavit that he told the prosecution that he did not have a criminal record. The prosecutor, who had no affirmative duty to check whether Mr. Clarke had a criminal record, did not do so. Consequently, the prosecutor cannot be faulted for failing to give *Brady* materials to the defendant that it did not possess and was under no duty to discover.

> Since it has not been established that the prosecution had knowledge or even a suspicion of Mr. Clarke's alleged criminal record, it is my opinion the prosecution did not fail in their obligation to provide the *Brady* materials requested.

*Id.* The Appellate Division denied leave to appeal on October 2, 1996.

### The Habeas Corpus Proceedings

The initial *pro se* petition claimed that: the conviction was based on perjured testimony in violation of due process; petitioner's due process rights under *Brady v. Maryland* were violated when the prosecutor failed to turn over Mr. Clarke's criminal record after he had specifically requested it; and his due process rights were violated by the denial of his right to testify before the Grand Jury. The court denied respondent's motion to dismiss the petition on statute of limitation grounds and, on August 10, 2000, appointed counsel to represent petitioner.

Following discovery and unsuccessful attempts to locate Mr. Clarke, a hearing was held on April 9, 2003. Petitioner's wife, Lametrous Turner, testified, credibly, regarding the circumstances of the recantation as follows: Three or four years after the trial she ran into Mr. Clarke in her neighborhood and, after she told him that her husband had been sentenced to ten to twenty years of imprisonment, Mr.Clarke told her that he had not wanted to testify at trial because it was all made up, but the District Attorney had a subpoena for him. Mr. Clarke told her that he was prepared to testify that petitioner had not robbed him and that what really happened was what petitioner had testified to in court. Mrs. Turner contacted petitioner's former attorney, Arthur Trakas, Esq., who drew up an affidavit which Mr. Clarke signed in her presence. Petitioner submitted the trial transcripts, Mr. Clarke's extensive

rap sheet which was provided after this court ordered respondent to obtain it, the omnibus motion made by petitioner's counsel requesting the criminal record of the prosecution's witnesses, ADA Sligh's affidavit and Mr. Clarke's affidavit. Respondent offered the testimony of ADA Sligh.

The credible testimony of ADA Sligh established that he had held various positions in the Queens District Attorney's office since 1981. ADA Sligh acknowledged that paragraph 10 of the omnibus motion made by petitioner prior to trial requested information "whether any person to be called as a witness by the prosecution is known, or, with due diligence could be known by the prosecution to: have been charged with a crime, convicted of a crime, or is or has been under psychiatric care. If the prosecution is unwilling to make such inquiry of its witness, the defense demands that it be supplied with the names and addresses of such witnesses sufficiently in advance so that it may make its own investigation." ADA Sligh testified that no response was made to this request.

ADA Sligh knew prior to trial that petitioner's defense was going to be that Mr. Clarke was bringing the charges in retaliation for a bad drug deal. When ADA Sligh asked Mr. Clarke about the drug allegations and about whether he knew petitioner, Mr. Clarke denied both drug dealing and knowledge of Mr. Turner. Other than asking Mr. Clarke, ADA Sligh took no additional steps and made no inquiries of any kind to find out if Mr. Clarke had any criminal arrest or conviction record prior to trial, nor did ADA Sligh check Mr. Clarke's record when petitioner filed his Section 440.10 motions based on Mr. Clarke's affidavit.

ADA Sligh testified that he could have asked a paralegal in his office, who had the ability to access the central computers in Albany, to run a rap sheet on Mr. Clarke by just submitting his name; fingerprints were not needed. ADA Sligh acknowledged that Mr. Clarke's conviction record showed that he had at least six arrests in Queens County prior to the trial in 1987. Information on these arrests, in addition to being available through the computers in Albany, was kept in docket books in the District Attorney's office. He had requested rap sheets on other witnesses if he had information that led him to believe that they had criminal records. ADA Sligh also testified that he was not aware whether police Officer Cardo ever requested rap sheets on victims.

> The Court: Then is it your understanding ... that in response to paragraph 10, that your office responded as if it had knowledge that, in fact, Mr. Clarke had not ever been arrested or convicted of a crime, because it did not either provide a rap sheet or provide the information that would allow the defense to get that information?
>
> ADA Sligh: I believe that is correct, Judge, that upon information and belief, we believed that we were not in possession of such information at that time, and that if we came into possession of it at a time before trial, we would turn it over. So, I think a combination of those things.

Hearing Transcript ("Hearing Tr.") 37–38. According to ADA Sligh, a bad drug deal was not an unusual defense; therefore, there was no reason for him to believe that Mr. Clarke had a criminal record.

In sum, the hearing evidence established that the prosecution, by not responding to the defense motion, represented to the defense that Mr. Clarke had no record.

Since Mr. Clarke did not appear at the hearing before this court, petitioner does not pursue his claim that he was denied due process of law because his conviction was based upon perjured testimony as to

the facts of the crime. Petitioner also does not pursue the Grand Jury claim, which raises no federal constitutional issue.

### Standard of Review

Under 28 U.S.C. § 2254:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court unless the adjudication of the claim -

(1) resulted in a decision that was contrary to or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under 28 U.S.C. § 2254(e)(1), a determination of a factual issue made by a State court shall be presumed to be correct. The applicant bears the burden of rebutting the presumption of correctness by clear and convincing evidence.

 Under *Williams v. Taylor,* 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), a state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." A state court decision is "an unreasonable application of" clearly established Supreme Court precedent if, from an objective standpoint, the state court applied Supreme Court precedent unreasonably, not simply incorrectly or errone-

ously. *Williams v. Taylor,* 529 U.S. at 409, 120 S.Ct. 1495.

Since in this case the state courts declined to hold an evidentiary hearing, no presumption of correctness applies to the state court factual "findings" under 28 U.S.C. § 2254(e)(1). *See Channer v. Brooks,* 320 F.3d 188, 195 (2d Cir.2003); *Drake v. Portuondo,* 321 F.3d 338, 345 (2d Cir.2003). *See also Ortega v. Duncan,* 333 F.3d 102, 106 (2d Cir.2003) (applying same principle where the state court did hold hearing, but refused to make factual findings). Since petitioner attempted to develop the record, but was denied a hearing in the state court, this court was not barred by Section 2254(e)(2) from conducting a hearing. *Drake,* 321 F.3d at 347.

The question then is whether the state court's rejection of petitioner's *Brady* claim was "contrary to" or involved "an unreasonable application of" federal law as determined by the Supreme Court, under 28 U.S.C. § 2254(d)(1), based upon the facts as found by *this* court.

### Discussion

 Under *Brady v. Maryland* and its progeny, state and federal prosecutors must turn over exculpatory impeachment evidence, whether or not requested by the defense, where the evidence is material to either guilt or punishment. *See United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Failure to do so results in a denial of due process irrespective of the good or bad faith of the government. *Brady,* 373 U.S. at 87, 83 S.Ct. 1194. The scope of the prosecutor's constitutional duty, and the defendant's constitutional right, is defined retrospectively, by reference to the likely effect that the suppression of particular evidence had on the outcome of the trial. *United States*

*v. Coppa,* 267 F.3d 132, 140 (2d Cir.2001).[2] "Under *Brady,* an inadvertent nondisclosure has the same impact on the fairness of the proceedings as deliberate concealment." *Strickler v. Greene,* 527 U.S. 263, 288, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). The clearly established law as of 1996, as recently summarized by the Supreme Court, provides that "[t]here are three components of a *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Id.* at 280–82, 119 S.Ct. 1936. A prosecutor can suppress evidence within the meaning of *Brady* even if he acted in good faith and even if the evidence is "known only to police investigators and not to the prosecutor." *Kyles v. Whitley,* 514 U.S. 419, 438, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

■ In *Agurs,* the Supreme Court distinguished three situations in which a *Brady* claim might arise: first, where previously undisclosed evidence revealed that the prosecution introduced trial testimony that it knew or should have known was perjured; second where the government failed to accede to a defense request for disclosure of some specific kind of exculpatory evidence; and third, where the government failed to volunteer exculpatory evidence never requested or requested only in a general way. *Agurs,* 427 U.S. at 103–107, 96 S.Ct. 2392. Favorable evidence is material and constitutional error results from its suppression "if there is a reasonable likelihood that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375. "The jury's estimate of the truthfulness and reliability of a given wit-

ness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness testifying falsely that a defendant's life or liberty may depend." *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

In *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Supreme Court applied the "due process criteria of *Napue v. Illinois* . . . and *Brady v. Maryland*" to find that the government's failure to disclose an alleged promise made to its key witness, that he would not be prosecuted if he testified, violated the defendant's due process rights. The Court determined that, even though the government attorney who tried the case did not know of the agreement when he elicited false answers on the witness stand, "the Government's case depended almost entirely on Taliento's testimony; without it there could have been no indictment and no evidence to carry the case to the jury. Taliento's credibility as a witness was therefore an important issue in the case and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it." *Giglio,* 405 U.S. at 154–55, 92 S.Ct. 763. *See Shih Wei Su v. Filion,* 335 F.3d 119, 127 (2d Cir.2003).

■ Here, petitioner specifically requested the conviction record of the State's witnesses. It is undisputed that, by not responding to that request, the prosecution was signifying that Mr. Clarke had no record. In addition, the circumstances of the alleged crime, at 5:00 a.m. outside a bar, and the ADA's knowledge that the defense was that the alleged victim had made up the robbery in retaliation

---

**2.** This court relies on recent Supreme Court cases and Second Circuit cases only insofar as they explain the clearly established law set forth by the Supreme Court as of 1996.

for a bad drug deal, all pointed to the need to check Mr. Clarke's record before offering him as a witness, and indeed offering him as a witness *without a record.* Other than the police officers, who testified only as to what Mr. Clarke told them, Mr. Clarke was the only witness to the alleged crime. Neither ADA Sligh, nor his partner, sought the requested impeachment evidence from any police officer or investigator, or ran a routine check for the presence of a criminal record. Indeed, the State did not run a rap sheet on Mr. Clarke, despite his affidavit in the Section 440.10 motions saying that he had a record, until required to do so in this habeas corpus proceeding.

The information requested was readily available to the prosecution had it made the most modest effort. Indeed, since some of Mr. Clark's arrests took place in Queens County, records of those arrests were available from the Queens County District Attorney's office itself. As the Court of Appeals for the Second Circuit recently held, saying it was applying established principles of Supreme Court law, "before a prosecutor puts to the jury evidence that a witness made no deal with the government, he or she has a fundamental obligation to determine whether or not that is so." *Shih Wei Su,* 335 F.3d at 127.

The respondent makes no argument that the defense was insufficiently diligent in pursuing the issue of Mr. Clarke's record. Any such argument would be without merit. *See Shih Wei Su,* at 128 ("When a prosecutor says that there was no deal and later elicits testimony from a witness denying the existence of a deal, it would be an unreasonable application of federal law, as determined by the Supreme Court, to fault the defendant for not proceeding in his cross-examination on the assumption that the prosecutor is a liar"). *See also Banks v. Dretke,* — U.S. —, 124 S.Ct. 1256, 1275, 157 L.Ed.2d 1166 (2004) ("Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed.")

Without Mr. Clarke's testimony, there was no evidence that a crime was even committed. His credibility was central to the State's case. *See United States v. Avellino,* 136 F.3d 249, 256–57 (2d Cir. 1998) (noting cases in which impeachment evidence was considered material where the witness in question supplied the only evidence linking the defendant to the crime, or supplied the only evidence of an essential element of the crime). Knowing this, ADA Sligh elicited Mr. Clarke's absence of a criminal record from him on the witness stand to bolster his credibility and to discredit petitioner. ADA Sligh acknowledged to the trial judge: "it's merely now a question of credibility and that question should ultimately be resolved by the trier of fact, the jury," and "ultimately it comes down to whether they believe Mr. Clarke or believe the Defendant." Tr. 215. ADA Sligh asked petitioner numerous questions about his own conviction record and encouraged the jury to consider that record when determining petitioner's credibility. Conversely, ADA Sligh noted Mr. Clarke's lack of a criminal record.

As the duty under *Brady* is defined retrospectively, under these facts, the prosecutor's representation that Mr. Clarke had no record, both to defense counsel and to the jury, when in fact he did, leads to the conclusion there was a violation of due process which resulted in a verdict unworthy of confidence.

In sum, petitioner has shown that "there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375. Thus, I find that a *Brady*

violation under clearly established federal law as determined by the Supreme Court has been established and that the trial court's decision was an unreasonable application of federal law as determined by the Supreme Court. Finally, whatever the applicable harmless error standard is in this case, *see Brown v. Keane*, 355 F.3d 82, 90–92 (2d Cir.2004); *Drake*, 321 F.3d at 347 and n. 4, the *Brady* error was clearly not harmless.

In addition, since the *Brady* violation resulted in perjured testimony being admitted at trial, I turn to whether, under *Agurs*, the prosecutor knew or should have known that the testimony he elicited was false, and if so, whether there is a reasonable likelihood that the false testimony could have affected the judgment of the jury. On this issue, *Drake v. Portuondo*, 321 F.3d 338 (2d Cir.2003), is instructive. There, the defendant confessed to the shooting deaths of the two victims, but claimed it was an accident. The sole issue at trial was his intent. Subsequent to the trial, at which Drake was convicted of second degree murder, defense counsel learned that the expert witness called by the prosecutor had lied about his credentials and indeed about the existence of his alleged area of expertise, "piquerism." Drake moved to vacate his conviction based upon newly discovered evidence that it was based on perjured testimony, but the Section 440.10 court denied his request for a hearing and decided that the record failed to establish that the prosecution was aware or should have been aware of perjury introduced at petitioner's trial. The Appellate Division affirmed. After the district court, relying on the state court's determination, denied habeas corpus relief, the Court of Appeals reversed and remanded the case to the district court to allow discovery and to conduct a hearing, if it determined that one was necessary, on whether the prosecutor knew or should have known of the perjury introduced at

trial. In *Drake*, the prosecutor made no independent inquiry into the expert witness's background and relied entirely on the recommendation of a dentist to vouch for the credentials of the prosecution's chief witness on aberrant psychology. The prosecutor conceded that the expert witness's testimony was meant to bolster what he perceived as the weakness of the State's case on intent, the sole issue at trial. The Second Circuit concluded that, if, at a hearing in the district court, "Drake can successfully establish that the prosecution knew or should have known of the perjured testimony, he may be able to establish a 'reasonable likelihood that the false testimony could have affected the judgment of the jury.' *Agurs*, 427 U.S. at 103, 96 S.Ct. 2392."

This case initially presented two issues involving perjured testimony admitted at trial. The first, which petitioner does not pursue, is that Mr. Clarke lied about the facts of the crime and whether a crime was even committed. The second, which is intertwined with the *Brady* claim discussed earlier, is that Mr. Clarke lied about his conviction record. It is now undisputed that Mr. Clarke's testimony about his record was false and therefore that perjured testimony was presented to the jury. Had the prosecutor fulfilled his *Brady* obligation, he not only would have known that Mr. Clarke had a record, he also would have known that Mr. Clarke had lied to him about his record. Therefore, there is a *Brady* violation not only for failure to turn over material impeachment evidence, but also for eliciting testimony that the prosecutor should have known was false. Since I have already found that there is a reasonable likelihood that, had the evidence been disclosed to the defense, the result of the proceeding would have been different, there is no difficulty in finding that there is a reasonable likeli-

hood that the false testimony could have affected the judgment of the jury.

While the Second Circuit in *Drake* referred to the "should have known" language in *Agurs* as "dictum," and noted that the Second Circuit had not yet drawn the contours of that phrase, it sent the case back to the district court for a hearing and stated: "If Drake can show that the prosecution knew (or should have known) about Walter's perjured testimony, relief may be justified." *Drake,* 321 F.3d at 347. In this case, once it is accepted that a *Brady* violation occurred in the prosecutor's failure to disclose Mr. Clarke's prior record, concluding that the prosecutor should have known of the perjury requires no drawing of subtle lines; it is obvious.

To clarify, this court holds that there has been a violation of due process based upon *Brady v. Maryland* for failure to turn over material impeachment evidence; that holding is sufficient in itself to require relief. In addition, on the facts of this case, there has also been a violation of due process based upon the admission of perjured testimony which the prosecutor should have known was false.

### Conclusion

The petition for a writ of habeas corpus is granted, and the judgment of conviction is vacated.

**SO ORDERED.**